**LONE STAR STEAKHOUSE & SALOON, INC., Plaintiff,**

v.

**Guy W. ADAMS and John Does 1–10, Defendants.**

**No. 01–1112–JTM.**

United States District Court, D. Kansas.

June 25, 2001.

Paul B. Swartz, Robert Martin, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, Kenneth J. Rubinstein, Thomas J. Fleming, Olshan, Grundman, Frome, Rosenzweig & Wolosky, LLP, New York City, for Plaintiff.

Tim J. Moore, Morris, Laing, Evans, Brock & Kennedy, Wichita, KS, John B. Quinn, Christopher Tayback, Michelle R. Fang, Quinn Emanuel Urquhart, Oliver & Hedges, LLP, Los Angeles, CA, for Defendants.

### MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on plaintiff's motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65. The motion is fully briefed and the court held a hearing on June 22, 2001. The motion is thus ripe for determination. For the reasons set forth below, the court grants plaintiff's motion in part and denies it in part.

### I. Factual Background

The present dispute arises out of the initiation of a proxy campaign by Guy W. Adams ("defendant") whereby he seeks to obtain a seat on the plaintiff's Board of Directors. Plaintiff is a Delaware Corporation with 283 restaurants across the nation. Its principal executive offices are located in Wichita, Kansas. Plaintiff has more than 8,000 beneficial owners of its common stock[1], which trades on the NASDAQ National Market System. The corporation is governed by a five-person Board of Directors ("Board") that meets on a regular basis in Wichita, Kansas. Defendant Adams ("defendant"), a California resident, owns approximately 1,100 shares of plaintiff's common stock, which he purchased for approximately $10,000.

In February 2001, defendant initiated a proxy contest seeking election to plaintiff's Board. To gain a seat, defendant must receive the vote of a majority of shareholders who attend plaintiff's annual shareholder meeting, which is scheduled for July 6, 2001. Defendant's preparation for the contest was initiated in late February 2001, when he mailed to plaintiff's executive offices a stockholder's notice of intent to nominate himself for election to the Board. Defendant then filed the following with the SEC: a Preliminary Proxy Statement on February 23, 2001; a Definitive Proxy Statement on March 16, 2001; an Amended Definitive Proxy Statement on April 9, 2001; another Amended Definitive Proxy Statement on May 4, 2001, and a final Amended Definitive Proxy Statement on June 1, 2001[2]. The April, May and

---

1. Of the 8,000 shareholders, 338 reside in Kansas.

2. The parties refer to this as the June 4 Filing Plaintiff lists the June 4 filing as Exhibit Q to its Memorandum in Support. The SEC filing

June Definitive Proxy Statements form the core of the present dispute. On June 20, 2001, defendant filed yet another Statement, which simply outlined the events surrounding the proxy contest up to the 20th. The June 20 Statement adds little to the proxy campaign and does not merit further discussion. As a point of clarification, the SEC files Amended Statements under the heading "Definitive Additional Materials." *See* Plf.Exs. N, P and Def.Ex. H. The SEC heading is instructive as to the practical impact of the Amended Statements, but the court will refer to the filings as "Amended Definitive Proxy Statements." Also on June 20, 2001, defendant mailed proxy materials to plaintiff's shareholders. Regardless, the court deems any SEC filings distributed because all filings are readily available to the public both through the Internet and other media.

On April 20, 2001, plaintiff filed the instant action, seeking an injunction to prohibit alleged violations of the Securities Exchange Act. Specifically, the complaint alleges that defendant's Definitive Proxy Statements contain materially misleading information regarding three separate issues: 1) purported shareholder support for defendant's proxy campaign; 2) "golden parachute" employment contracts which plaintiff granted to members of its management; and 3) defendant's claim that he is the "sole participant" in his proxy campaign. Plaintiff now seeks an order enjoining defendant from voting any proxies obtained in violation of the Securities Exchange Act which prohibits proxy statements that are "false or misleading with respect to any material fact." 17 C.F.R. § 240.14a–9(a).

### A. Facts Relating to Alleged Shareholder Support Misstatements

Defendant's April 9 Definitive Proxy Statement states:

> In my preliminary conversations, a number of institutional and individual stockholders have told me orally that they would vote for my election to the Board. Among those indicating their support are:
>
> California Public Employee's Retirement System (assets: $165 Billion), and The Amalgamated Bank Longview Midcap 400 Index Fund (assets: $100 Million)
>
> To date, the holders of over 13% of the shares outstanding have advised me that they intend to vote for me and against Mr. Coulter.

Plf.Ex. N, April 9 Amended Definitive Proxy Statement, at 2. During his deposition, defendant testified that the 13% estimate consisted of the following supporters: CalPERS (300,000 shares/1.2%); Greenlight Capital, LLC (1,055,600 shares/ 4.23%); Chilton Investments, Inc. (1,800,-900 shares/7.21%); and the Amalgamated Bank of New York Long View Mid–Cap 400 Index (3,000 shares/.012%). *See* Plf. Exs. B at 103, V (Draft Schedule 13D revealing institutional supporters). Defendant further testified that he could not articulate any individual supporters besides himself. Consequently, at the time defendant filed the April 9 Statement, he could only account for support from the holders of 12.65% of plaintiff's outstanding shares. This support level was further eroded when Chilton Investments sold more than 70% of its Lone Star stock before the record date [3], leaving it with

date on Exhibit Q appears to be May 31. The court notes that Defendant's Exhibit H provides two documents, both with an SEC file date of May 31 and signature dates of June 1 and June 4. Defendant's Exhibit H contains plaintiff's Exhibit Q and adds the June 1 letter. The court's primary interest lies in the letter which, similar to the April 9 and May 4

Statements, begins with the heading "Who is Guy W. Adams?" As such, when the court refers to the June 1 Statement, it is referring to the letter contained in Def.Ex. H.

**3.** The date on which voting rights inure to a shareholder. Only shareholders of record on

approximately 2% ownership of plaintiff's shares. The sale of Chilton's shares left defendant with a claim to support from the holders of only 7.44% of plaintiff's shares. The court also notes that both Chilton Investments and Greenlight Capital refused to allow defendant to utilize their names in his proxy materials. Plf.Ex. B at 99.

Defendant's May 4 Proxy Statement was essentially unchanged regarding his claimed level of support. However, the June 1 Statement completely omits the third paragraph from the April 9 Statement listed above. Defendant's most recent filing thus omits any claim to a specific amount of support. Plaintiff argues that the omission in the June Statement is of little consequence because the June filing did not address the claims of the earlier two filings which could leave shareholders with the impression that defendant retains 13% shareholder support.

### B. Facts Relating to Alleged Employment Contract Misstatements

Plaintiff asserts defendant's April 9 Proxy Statement made five independent false or misleading statements relating to the director's employment contracts. First, in discussing "golden parachute contracts recently given to Mr. Coulter and his management team," defendant asserts that "the current directors of the Company have given away rights that can be triggered by the stockholders of the Company simply exercising their rights under Delaware Law to nominate and elect directors." Plf.Ex. N, April 9 Proxy Statement, at 3. Plaintiff accurately points out that defendant's statement is inaccurate as to all contracts except that of Mr. Coulter, plaintiff's Chairman and Chief Executive Officer. All employment contracts other than Coulter's require additional events to occur after a change of control. Defendant

apparently recognized the error. In his May 4 Proxy Statement, defendant states: "Furthermore, it is to be noted that, in the case of Mr. Coulter, these benefits could be triggered simply by we shareholders exercising our democratic rights to elect the composition of the Board of Directors . . ." Plf.Ex. P, May 4 Proxy Statement, at 3. Defendant's May 4 Statement is thus accurate, but he made no effort to clarify the error contained in the April 9 Statement and thus arguably leaves the impression that all of the contracts are single-trigger in nature.

Plaintiff's second, third, and fourth assertions of error in defendant's April 9 Statement are related. The central issue of the assertions involves defendant's alleged misinterpretation of the employment contracts. Defendant's April 9 Statement drastically overstated the company's liability on the contracts because he believed that the contracts did not provide any deduction or offset for the exercise price of the options potentially surrendered under the contracts. For example, defendant stated that the company's potential liability on the "change of control" rights discussed above would be between $65 and $85 million. In fact, taking into account an offset for the exercise price of the options in question, the maximum liability would be $1.47 million, assuming a present share price of $13 and an average option exercise price of $8.50. The same error resulted in an overstated amount of liability on the contract provisions requiring the company to "gross up" for tax purposes any buyout amount under the contracts.

Defendant asserts that the April 9 Statement was accurate when made based upon the contracts as disclosed at the time he prepared the Statement. His argument has support in the record. After receiving an April 19, 2001 letter from and having

the record date are entitled to vote at the shareholder meeting.

discussions with representatives from Cal-PERS regarding the contracts and the assertions in defendant's April 9 letter, plaintiff filed a form 10–K/A amending its disclosure relating to the employment contracts. According to plaintiff, it did not amend the contracts. Nonetheless, plaintiff's 10K/A did make further disclosure as to the nature of the contracts in question. In view thereof, defendant's May 4 Statement states:

> [A]s initially approved by the 'independent' Directors and filed with the Commission, these Golden Parachute Contracts did not provide for an offset for the exercise price of the options to be cashed out.... THE FAILURE TO PROVIDE FOR AN OFFSET OF THE EXERCISE PRICE COULD HAVE EXPOSED LONE STAR TO COMPENSATION AND TAX CLAIMS IN EXCESS OF $65 MILLION.

> I am grateful that corrective action has now been taken as described by the Company in its Form 10–K/A. However, I am disappointed that it took Lone Star until April 18, 2001 to address the situation with its executives and until April 25, 2001 to advise stockholders and the market that the issue had been addressed.

Plf.Ex. P, May 4 Proxy Statement, at 4. Plaintiff does not contend that the May 4 Statement is misleading or false, but simply states that defendant should have taken steps to indicate that the April 9 Statement is no longer accurate.

Finally, plaintiff points out that defendant's April 9 Statement erroneously suggested that the employment contracts granted Coulter five years from a triggering event to select between either fully vested options or cash as a means of compensation. The contract does give Coulter the stated option, but gives him only five days to make his decision. As such, defendant's April 9 Statement was in error.

However, the defendant corrected the error in both the May 4 and June 1 Statements. Plaintiff again asserts that the Statements continue to be misleading as defendant did not instruct shareholders to disregard the April 9 letter.

### C. Facts Relating to Alleged Participation Misstatements

Defendant claims that he is the "sole participant" in this proxy campaign. Plaintiff disputes that claim and points to numerous circumstantial facts by which it seeks to establish the existence of undisclosed participants. The SEC defines "participants" to include:

> (iii) Any committee or group which solicits proxies, any member of such committee or group, and any person whether or not named as a member who, acting alone or with one or more persons, directly or indirectly takes the initiative, or engages, in organizing, directing or arranging for the financing of any such committee or group;

> (iv) Any person who finances or joins with another to finance the solicitation of proxies, except persons who contribute not more than $500 and who are not otherwise participants;

> (v) Any person who lends money or furnishes credit or enters into any other arrangements, pursuant to any contract or understanding with a participant, for the purpose of financing or otherwise inducing the purchase, sale, holding or voting of securities of the registrant by any participant or other persons, in support of or in opposition to a participant; except that such terms do not include a bank, broker or dealer who, in the ordinary course of business, lends money or executes orders for the purchase or sale of securities and who is not otherwise a participant; and

> (vi) Any person who solicits proxies.

SEC Rule 14a–101, Item 4, Instruction 3(iii)–(vi).

In attempting to establish the existence of other participants, plaintiff relies heavily on a letter from GWA Capital[4] to CalPERS. The letter was an attempt by defendant to obtain financial support from CalPERS for his proxy campaign. Defendant made several statements in the letter suggesting that his campaign actually involved a plurality of participants. For example, defendant states: "I form a separate Investors Partnership (or LLC) for *my Investors* and put in $10 million. . . . Regarding possible ventures in the future, please keep *us* in mind . . . *we* would be glad to hear from you. Again, our expertise is in the arena of dealing with undervalued, mismanaged companies. *We* set up investment vehicles (partnerships) for each specific company and invest *our* own capital. *We* would welcome the opportunity to find ways to work with you, as we develop a relationship." Plf.Ex. G (emphasis added). Defendant avers to the fact that he is, in fact, the sole participant in this campaign, but plaintiff applies great effort to fill the gap between "I" and "we."

Plaintiff first points out that, at the time defendant was initiating this proxy contest, he moved from his home-based office to an office provided by the Craig Corporation ("Craig Corp.") in Los Angeles, California. Craig Corp. is a publicly traded company that seeks to identify, acquire, and own other operating companies. Craig Tompkins is the president of Craig Corp. and now asserts his status as pro bono counsel for defendant in the instant proxy campaign and litigation. Mr. Tompkins states, by affidavit, that he is assisting defendant with legal representation on a pro bono basis with the understanding that defendant will compensate him if defendant is elected to plaintiff's Board and receives compensation on the basis of that position.[5] Defendant acknowledges that he has not paid Craig Corp. rent for the use of the office space. Plf.Ex. B, at 118. However, he contends that Craig Corp. has excess office space that it allows him to use as a personal favor. Defendant does pay for his own telephone usage, office supplies, and parking. Plaintiff further implies additional participation by seeking to establish that Craig Corp. and its majority shareholder, James Cotter, have a long history of participating in proxy contests and corporate takeovers. Based largely on the Exhibits attached to plaintiff's Reply Memorandum, the court is largely convinced of Cotter and Craig Corp.'s participation in various corporate takeover activities. *See* Plf. Reply Ex. 1–7. To further its assertion of other participation, plaintiff alleges that Craig Corp. failed to properly respond to a subpoena[6] and that both Cotter and Tompkins have taken efforts to evade service.[7] Based on the circumstantial evidence derived from

---

4. Defendant does business in California under the *registered fictitious business name* of GWA Capital.

5. Defendant also claims that his primary litigation counsel, from the Los Angeles law firm of Quinn Emanuel Urquhart Oliver & Hedges, LLP, have agreed to represent him under essentially the same agreement. *See* Adam's Declaration, at ¶ 36.

6. To excuse non-compliance with the subpoena, defendant argues that plaintiff served Craig Corp with the subpoena on May 24, 2001 (the Thursday before Memorial Day weekend). The subpoena called for an appearance and production of documents on the 30th (second business day after the holiday). Defendant thus asserts that compliance with the subpoena was highly inconvenient. Nonetheless, defendant points out that Tompkins did provide a response on May 29.

7. *Plaintiff also points out that Tompkins has asserted attorney-client privilege to allegedly avoid discovery regarding his relationship with defendant.*

the defendant's relationship with Craig Corp. and Tompkins, plaintiff argues that Craig Corp. is a participant in defendant's proxy campaign and constitutes part of the "we" in defendant's letter to CalPERS.

Plaintiff next contends that one of defendant's "private equity" clients is supporting his campaign. For the past ten years, defendant has been engaged in the business of providing investment and securities advice in part to private investors. Defendant provides the service of recommending undervalued securities to his clients. He is then compensated based on the appreciation in value of his suggested securities. Defendant states, in his April 9 Proxy Statement, that plaintiff is an undervalued company. Based on this, plaintiff argues that defendant must have suggested Lone Star securities to his "private equity" clients and that some of them must be supporting his campaign. Specifically, plaintiff points to the Potikers, a California family which was defendant's primary source of income in 2000 and which holds a significant number of shares of plaintiff's stock.[8] Plaintiff offers little specific support for this allegation other than inferences raised by the fact that defendant, at the instruction of his attorney, refused to answer questions relating to the Potikers during his deposition and that it seems unlikely that the Potikers, as owners of a large number of plaintiff's shares, would have no interest in defendant's proxy campaign. Defendant responds that, by not answering questions relating to his clientele, he was simply trying to protect his clients and his future business interests with them from being alienated as a result of this allegedly unrelated litigation. The court does note that Brian Potiker voluntarily came forward and averred that neither he nor his family, nor any business associated with the Potiker family, were supporting or taking part in any way in defendant's proxy campaign.

Finally, plaintiff resorts to innuendo and assumption to establish the existence of other participants in defendant's campaign. First, plaintiff asserts that defendant does not possess the financial capacity to undertake a proxy campaign on his own. Defendant acknowledges that this proxy campaign will likely cost more than $50,000. Plaintiff claims that defendant's personal aggregate assets are limited to $77,000 and that he will therefore be unable to conduct the campaign on his own. However, defendant's declaration and the attached Exhibit Y indicate that he has a net worth of $173,610. Plaintiff also suggests that defendant has no individual incentive to pursue this campaign since his own investment in plaintiff is little more than $10,000. Defendant responds by noting various intangible values obtained by pursuing his chosen course of action. Additionally, plaintiff argues that defendant must be hiding some relationship because he allegedly attempted to thwart discovery. On defendant's part, the efforts essentially amounted to refusing to answer a number of questions during his deposition relating to his "private equity" clients. As noted above, plaintiff also relies on Craig Corp.'s refusal to comply with a subpoena and Tompkins' assertion of privilege.

## II. Preliminary Injunction Standards

 The Tenth Circuit requires a movant.to establish four elements as the basis for issuance of a preliminary injunction: (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs any damage to the oppos-

---

8. Brian Potiker owns approximately 121,000 shares of Lone Star stock as of the record date. *See* Brian Potiker Affidavit.

ing party; (3) the injunction, if issued, will not be adverse to the public interest; and (4) a substantial likelihood exists that the moving party will prevail on the merits. *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991). The plaintiff argues for a more lenient standard on the fourth element because when the first three elements are clearly satisfied, the Tenth Circuit has indicated that courts should substitute a more lenient "fair ground for litigation" standard for the prerequisite of "a substantial likelihood that the moving party will prevail on the merits." *Resolution Trust Corp. v. Cruce,* 972 F.2d 1195, 1199 (10th Cir.1992); *Otero Savings & Loan Association v. Federal Reserve,* 665 F.2d 275, 278 (10th Cir.1981). On the other hand, defendant argues that a stricter standard should be applied because the present case involves a particularly disfavored form of relief. Certain types of preliminary injunctions are so disfavored that the movant must satisfy an even heavier burden before they may be issued. *SCFC,* 936 F.2d at 1098–99. These include preliminary injunctions that (1) disturb the status quo; (2) that are mandatory rather than prohibitory; or (3) that afford the movant "substantially all the relief he may recover at the conclusion of a full trial on the merits." *Id.* Plaintiff appears to contest the fact that the preliminary injunction sought falls into the third category. The court finds this denial to be inconsistent with the position taken by plaintiff in opposition to defendant's motion to dismiss for lack of jurisdiction. In that context, plaintiff argued both in its brief and at hearing that the court should not dismiss the case because it would be finished after the preliminary injunction stage. In other words, a preliminary injunction was the relief requested by plaintiff and is thus "substantially all the relief [plaintiff] may recover." Additionally, the court construes many of plaintiff's statements as requests for mandatory injunctive relief. *See* Plf. Brief, at 33 ("At a minimum, Adams should be immediately required to make adequate and proper corrective disclosure."); Plf. Reply Brief, at 5 ("the relief Lone Star seeks is merely a preliminary injunction which would require Adams to make proper corrective disclosure."). These statements indicate that plaintiff is asking the court to order plaintiff to "make proper corrective disclosure." Such injunctive relief is mandatory in that it requires a positive act by defendant as opposed to simply maintaining the status quo. The court thus will apply the stricter standard rather than the more lenient standard advocated by plaintiff. Consequently, plaintiff must show that, "on balance," the four preliminary injunction factors "weigh heavily and compellingly" in plaintiff's favor. *SCFC,* 936 F.2d at 1099.

### III. Analysis of the Four Preliminary Injunction Factors

The court finds that the first three factors "weigh heavily and compellingly" in plaintiff's favor. First, assuming, *arguendo,* that defendant's Definitive Statements are misleading to some extent, plaintiff will suffer irreparable injury if the court does not enjoin defendant from soliciting proxies based on such Statements. Again assuming that defendant's Statements contain materially misleading information, the shareholder vote will go forward on the basis of such information unless the court grants the plaintiff's request for injunctive relief. The Supreme Court has recognized that "use of solicitation which is materially misleading poses the kind of irreparable injury to stockholders which can justify injunctive relief prior to a shareholder's meeting." *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 383, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970). However, five years after the Supreme Court decided *Mills,* it held that *Mills* did not stand for the proposition that mere violation of the Exchange

Act establishes irreparable harm. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 64–65, 95 S.Ct. 2069, 2078–79, 45 L.Ed.2d 12 (1975). Instead, the Court held that courts must judge an application for injunctive relief according to traditional equitable principles which require a separate showing of irreparable harm. *Id.* Defendant thus cannot prove irreparable harm merely by showing a material false solicitation.

■ Nonetheless, the court finds irreparable injury would occur absent an injunction prohibiting the voting of proxies based upon false and misleading information. At a minimum, the free and intelligent voting rights of plaintiff's shareholders will be forfeited if such votes are exercised based upon false or misleading information. Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights. Nor can post-vote relief be considered an effective remedy. "That the court could later undo the damage caused by an illegal proxy—by voiding the results of the election—is not an adequate alternative where, as here, the court can prevent in advance a shareholder vote to be taken on potentially misleading and incomplete information." *Chambers v. Briggs & Stratton Corp.*, 863 F.Supp. 900, 906 (E.D.Wis.1994). Even if the court allows the election to proceed forthwith and defendant loses the proxy fight, plaintiff will be irreparably injured in that its shareholders will have negative impressions of the Board based upon allegedly false and misleading information disseminated by defendant during the proxy dispute. This kind of damage to the Board's reputation and concomitant decrease in the level of shareholder trust cannot be quantified and cannot be compensated in a post-vote exercise of the court's equitable power. Thus, a vote based on misleading information would irreparably harm both plaintiff and its shareholders. Plaintiff has established to

the court's satisfaction that it would suffer irreparable injury in the absence of injunctive relief designed to remedy any false or misleading information in defendant's Proxy Statements.

The court also finds that the balance of hardships in this case clearly favors plaintiff. As noted above, plaintiff is subject to irreparable injury to its reputation and shareholder trust at a minimum, and may be subject to a major change in its Board of Directors based upon allegedly false and misleading information. On the other hand, plaintiff is asking the court to order defendant to make a corrective disclosure filing with the SEC. Such a filing would take a brief amount of time to prepare and file and would involve little expense. The hardship to defendant should the injunction issue is thus minimal. Finally, the court finds that the requested injunction would not be adverse to the public interest. Indeed, the public interest always lies with the truth. Again assuming the existence of materially misleading information, a full disclosure of such information, prior to any vote based thereon, will best serve the shareholding public.

■ The central issue is whether or not defendant's April 9, May 4, and June 1 Definitive Proxy Statements contain false or materially misleading information. Plaintiff alleges a violation of Section 14(a) of the Securities Exchange Act of 1934, which provides:

> It shall be unlawful for any person … in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for protection of investors, to solicit or to permit the use of his name to solicit any proxy …

15 U.S.C. § 78n(a). Clearly, section 14(a) prohibits the solicitation of proxies in violation of rules and regulations promulgated by the Securities Exchange Commission

(SEC). The specific rule in question is Rule 14a–9, which provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9. In order to establish a violation of section 14(a) and Rule 14a–9, plaintiff must prove three elements: (1) that the proxy contained a material misrepresentation or omission; (2) that the defendant was at least negligent, and (3) that the proxy "was the essential link in completing the transaction in question." *Wilson v. Great American Industries, Inc.,* 661 F.Supp. 1555, 1562 (N.D.N.Y. 1987). For a misleading fact or omission to be material, there must be a substantial likelihood that the reasonable investor would have viewed the disclosure of the fact as having significantly altered the "total mix" of information made available. *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). As to the second element, negligent misrepresentation is sufficient—plaintiff need not plead or prove scienter. *Wilson v. Great American Indus., Inc.,* 855 F.2d 987, 995 (2d Cir. 1988). Under the third element, the proxy solicitation containing the material misrepresentation or omission must be " 'an essential link in the accomplishment of the transaction' giving rise to the litigation." *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 383 (2d Cir.1974). *See also Mills,* 396 U.S. at 385, 90 S.Ct. at 622 ("The proxy solicitation itself [must be] an essential link in the accomplishment of the transaction."). The third element does not merit further discussion in this case since all of defendant's Proxy Statements are essential links in his proxy campaign. Given the above framework, the court will evaluate whether plaintiff has "compellingly" shown a likelihood that it will prevail on the merits of its claims as to each of the independent allegations of misrepresentation.

### A. Alleged Shareholder Support Misstatements

■ Based on the facts stated above, the court finds that defendant's Proxy Statements contain material misrepresentations as to his level of shareholder support. Defendant's April 9 and May 4 Statements contain his claim to support from the holders of more than 13% of plaintiff's outstanding shares. This statement is inaccurate.[9] As discussed above, the sale of stock by one of defendant's largest supporters cut defendant's claim to support to slightly more than 7%. Indeed, defendant tacitly admits the change in circumstances by omitting any reference to a specific amount of support in his June 1

---

**9.** Defendant argues that, initially, his support level was at 12.65% and possibly higher and that such a minor difference from the claimed amount is immaterial. Assuming that defendant could still show support of 12.65%, the court might agree with this argument. However, defendant lost much of his support from Chilton Investment when Chilton sold a large portion of its Lone Star stock. As such, defendant's 13% support claim is no longer accurate by any accounting. Rule 14a–9 requires defendant to clearly state any information needed to correct an earlier filing. This requires defendant to clearly state, by corrective disclosure, that his April 9 claim of 13% support is now inaccurate even if the claim was accurate when made.

Statement. Additionally, all of defendant's Statements indicate support from a "number of individual stockholders." Despite being called to account for this assertion in his deposition, defendant could not identify any specific individual stockholders. As such, the statement is likewise inaccurate.

The parties discuss numerous cases that consider the issue of whether true statements of shareholder support are inherently misleading. Those cases are irrelevant. The court need not consider whether defendant's statements are inherently misleading because defendant's statements were actually misleading—they were inaccurate. Defendant cannot, after Chilton Investments sale of its Lone Star stock, establish more than 13% support. Nor can he establish the support of a "number of individual stockholders." Because defendant clearly intended his statements regarding support to generate a bandwagon effect on other shareholders, they are material. If shareholders believe that a significant number of other investors support defendant, that belief will likely impact the decisions of those investors with less time to research the claims of either existing management or the proxy contender. Nor does the fact that defendant's June 1 Proxy Statement omits any mention of the 13% claim constitute corrective disclosure. As stated in Rule 14a–9, defendant cannot omit any material fact "necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." Rule 14a–9. In summary, plaintiff has "compellingly" established its likelihood of success on the merits of its section

14a claim as it relates to defendant's shareholder support statements. Defendant must make corrective disclosure in a manner to be approved by the court, as to the claim of more than 13% support and the claim of support from a "number of individual stockholders."

### B. Alleged Employment Contract Misstatements

■ Again, defendant has tacitly conceded that his April 9 Proxy Statement was inaccurate as it related to a number of aspects of plaintiff's employment contracts with its directors. Defendant does not contend that such misstatements were immaterial, but instead argues that he already provided corrective disclosure through his May 4 Proxy Statement. The court finds that the May 4 Proxy Statement did, in fact, correct the misstatements from defendant's April 9 Statement. However, the May 4 Statement did not call specific attention to the earlier communication which was admittedly misleading. As noted in plaintiff's reply, "once a misstatement has been made in violation of the 1934 Act, merely including a correction or providing supplemental information ... is not enough. A corrective disclosure must call attention specifically to the prior misstatement, telling the investor that the statements were inaccurate and disclose the truth." *American Insured Mortg. Investors v. CRI, Inc.*, 1990 WL 192561 (S.D.N.Y.1990). The court thus orders defendant to make corrective disclosure of the errors contained in his April 9 Definitive Proxy Statement. The disclosure must call attention to the erroneous statements [10] and include an accurate statement

---

**10.** To clarify, the erroneous statements include: 1) that all of plaintiff's management team have "golden parachute" contracts which are triggered solely by a change of control event, as opposed to only Mr. Coulter's; 2) that the contracts did not provide for an offset in the exercise price of options involved; 3) statements regarding the alleged potential liability to the company resulting from excluding the option offset; and 4) that Mr. Coulter's contract provides a five year, as opposed to a five day, term in which Coulter can select between new options and cash.

of his present understanding of the contracts.[11]

### C. Alleged Undisclosed Participants

Plaintiff first seeks to establish that Craig Corp. is a participant in defendant's proxy campaign, and paints an interesting factual collage in its effort. Defendant, in his letter to CalPERS, clearly suggests that other entities or persons are involved in his proxy contest. Then, he moves into offices provided by Craig Corp. free of rent. Craig Corp.'s president, Craig Tompkins, provides pro bono legal assistance in defendant's proxy campaign and claims to do so out of respect for what defendant is attempting to accomplish. It is clear that in the recent past Craig Corp. and its majority shareholder, James Cotter, have engaged in numerous proxy battles and other corporate takeover activities. It is also clear that Craig Corp., Cotter, and Tompkins have arguably sought to at least avoid, if not evade, discovery. In support of his position, defendant presents his own affidavit and the affidavit of Craig Tompkins both averring that they have not entered any agreement to finance, lend money, advance credit and have not taken any other measures to advance defendant's proxy solicitation. Tompkins additionally states that neither Craig Corp. nor its principal shareholder, James Cotter, have entered into any such agreements.

The court is not blind to the inferences raised by the facts outlined above, but nonetheless finds that injunctive relief in this area is inappropriate. Plaintiff insinuates that such a determination would be tantamount to the court "sticking its head in the sand." However, such a view ignores the fact that plaintiff bears the burden, in this context, to "heavily and compellingly" prove that others are supporting plaintiff or that others are directly participating in the present proxy contest. Plaintiff has simply not met that burden. Many of the inferences plaintiff raises could be explained in an innocent manner. For example, if the court desired to initiate a proxy contest, wouldn't it be considered expedient for the court to seek the advice of someone experienced in such matters. Perhaps, that is exactly what defendant has done—sought the advice of Tompkins' experience in such matters. Further, Tompkins states that he has known defendant for more than ten years and finds him to be a "bright, articulate and honest individual." He further states that if defendant were not using the extra space at Craig Corp., then the office would be unused. All of these statements are consistent with the idea that Tompkins is simply an "old friend" of defendant that is attempting to assist him in his endeavors without any direct self-interest in the proxy campaign. Nonetheless, plaintiff argues that Craig Corp. is a participant in that it is paying Tompkins to provide advice and assistance to defendant. If this were true, Craig Corp. would be a "participant" under the SEC regulations outlined above. However, Tompkins states that he is essentially helping defendant on his own

---

**11.** Specifically, defendant should quote the offending language and then provide a brief statement as to the actual contract contents. The court recognizes defendant's position that his April 9 statements were originally correct given the level of disclosure offered by plaintiff. However, after plaintiff clarified the contracts, defendant had a duty to clearly indicate that his April 9 statements were no longer valid. In essence, his May 4 Statement simply added another chapter to his materials, but did not clearly indicate that his prior April 9 statements were invalid. Because plaintiff did not request any relief regarding the May 4 Statements, the court does not require any corrective disclosure as to any of defendant's statements regarding whether the contracts were originally accurate or whether defendant played a role in clarifying the contracts.

time and has not received any compensation for such assistance from Craig Corp. Tompkins Affidavit, at 5 ("I am not representing Mr. Adams as a part of by duties as an officer or director of Craig Corporation or of any other entity. I am, rather, doing this on the same basis that I do a variety of other not-for-profit activities."). The court finds that plaintiff has not "compellingly" established its claim that Craig Corp. is a participant in defendant's proxy campaign.

Plaintiff's claim relating to the Potiker family's alleged participation is even more attenuated. It points out that the Potikers and their related business entities are defendant's private equity clients and that Brian Potiker owns a significant amount of Lone Star stock. Against these insinuations, defendant relies on his sworn denials and those of Brain Potiker. Both state that there is no relationship or agreement to pursue the instant proxy campaign. Plaintiff urges the court to disregard Potiker's statement in view of defendant's conduct in allegedly attempting to evade discovery relating to the Potiker's. This argument does not persuade the court and plaintiff has presented no other viable reason to dismiss Potiker's sworn statement that he has not participated in any way in defendant's proxy campaign. The court finds that plaintiff has not "compellingly" established its claim that any member of or entity controlled by the Potiker family is a participant in defendant's proxy campaign. As such, the court denies plaintiff's motion as it applies to the forced disclosure of allegedly undisclosed participants.

The court instructs both parties to submit proposed corrective disclosures covering defendant's misleading statements regarding the plaintiff's employment contracts and regarding the level of shareholder support anticipated. The proposals are due by 9 a.m. on June 26, 2001. The court will review the disclosure and issue, to defendant, a statement which he will file immediately with the SEC.

IT IS THEREFORE ORDERED this _____ day of June, 2001 that plaintiff's motion for injunctive relief (dkt. no. 40) is granted in part and denied in part.