ATLANTIC COAST AIRLINES
HOLDINGS, INC.,
Plaintiff,

v.

MESA AIR GROUP, INC., Defendant.

No. CIV.A. 03–2198(RMC).

United States District Court,
District of Columbia.

Dec. 18, 2003.

Paul Blenkenstein, Michael L. Denger, James Robert Loftis, III, Gibson, Dunn & Crutcher, Washington, DC, Elizabeth A. Brem, Wayne Smith, Gibson, Dunn & Crutcher, Irvine, CA, Michael Krauss, Gibson, Dunn & Crutcher, New York City, Raymond J. DiCamillo, Richards, Layton & Finger, PA, Wilmington, DE, Robert E. Cooper, Gibson, Dunn & Crutcher, Los Angeles, CA, for Plaintiff.

James K. Robinson, Stephen Michael Chippendale, Cadwalader, Wickersham & Taft, Washington, DC, Jonathan Ian Gleklen, Arnold & Porter, Washington, DC, for Defendant.

Anika Sanders Cooper, Office of Corporation Counsel, D.C., Washington, DC, for Commonwealth of Virginia and District of Columbia.

## MEMORANDUM OPINION

COLLYER, District Judge.

At its core, this case involves a dispute over the future of Atlantic Coast Airlines Holdings, Inc. ("Atlantic Coast" or "ACA"): will it be a regional carrier for major airlines or an independent low-fare operator? It is presented to the Court in the context of a consent solicitation to replace the company's Board of Directors.

Atlantic Coast currently operates as a regional air carrier under the United Express and Delta Connection brands in the Eastern and Midwestern United States, as well as Canada. On July 28, 2003, Atlantic Coast announced plans to transform itself into an independent, low-fare airline based at Washington Dulles International Airport ("Dulles"). This new strategy was prompted in large measure by the bankruptcy reorganization of United Airlines, Inc. ("United") and the expectation that United would reject the current United/ACA code-sharing agreement under which ACA operates as a United Express ("UAX") carrier. On October 6, 2003, Mesa Air Group, Inc. ("Mesa"), a fellow regional air carrier and ACA shareholder, submitted an unsolicited proposal to acquire Atlantic Coast for the stated purposes of keeping Atlantic Coast in its traditional role as a UAX carrier and creating the leading regional airline in the United States. When the Atlantic Coast Board of Directors ("ACA Board") rejected the pro-

posal, Mesa filed a preliminary consent statement with the Securities and Exchange Commission ("SEC"), pursuant to which Mesa seeks the consent of Atlantic Coast shareholders to replace the ACA Board with Mesa nominees.

Pending before the Court is Atlantic Coast's Amended Motion for a Preliminary Injunction, in which ACA asks the Court to prevent the consent solicitation from going forward. Atlantic Coast brings both securities and antitrust claims against Mesa. ACA alleges that Mesa has violated §§ 14(a) and (e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a) and (e), by issuing a preliminary and two revised preliminary consent statements, press releases, and other public statements that contain materially false and misleading statements and omissions. ACA also alleges that Mesa has violated § 1 of the Sherman Act, 15 U.S.C. § 1, § 7 of the Clayton Act, 15 U.S.C. § 18, and the District of Columbia Antitrust Act, D.C. CODE § 28–4502, by entering into an agreement with United that will have the effect of eliminating competition by blocking the entry of ACA's planned low-fare airline into the marketplace. Mesa counters that its solicitation materials fully and accurately disclose all pertinent information, including the allegations of this lawsuit, and that its actions to continue Atlantic Coast as a feeder airline for United do not run afoul of the antitrust laws. Following a deluge of briefs and exhibits, and a preliminary injunction hearing, the parties agreed that the Court would have ten days to render its decision. Having considered all the materials submitted, the entire record in this matter, and the demeanor and credibility of the testimony of the witnesses, the Court will grant a preliminary injunction enjoining Mesa from proceeding with the consent solicitation or exchange offer until this matter can be heard and decided on the merits. The defendant's motion to dismiss will be denied without prejudice. A confirming order will be issued.

## I. FACTUAL BACKGROUND

Atlantic Coast has operated as a regional air carrier for United at Dulles since 1989. At the beginning of the business relationship between these two airlines, Atlantic Coast received a prorated portion of the revenues collected when a passenger connected from an Atlantic Coast aircraft to a United aircraft. Although all seats were sold as United seats, Atlantic Coast selected which routes to fly and how frequently to fly them. In January 2000, United and Atlantic Coast switched to a "fee-per-departure" arrangement, under which United assumed substantially more control over Atlantic Coast's operations. United now sets the fares for UAX flights, selects which routes ACA flies, and determines how frequently Atlantic Coast serves those routes. In return, United pays Atlantic Coast a pre-negotiated fee for each flight ACA operates as United Express. ACA is the largest UAX carrier; it flies approximately 500 flights per day serving approximately 50 cities.

Atlantic Coast began to explore alternative business strategies in early 2001 to supplement or replace its operations as a regional air carrier servicing major airlines. United's bankruptcy filing on December 9, 2002, added to Atlantic Coast's concern about the wisdom of continuing to do business as a feeder airline. The fact that United has used the bankruptcy process to re-negotiate for significantly lower costs in its UAX agreements with regional airlines across the country has not helped to assuage ACA's concerns. After months of unsuccessful negotiations with United, Atlantic Coast publicly announced on July 28, 2003 that it anticipated that United would reject the existing United/ACA

code-share agreement through the bankruptcy court and that Atlantic Coast planned to establish an independent, low-fare airline based at Dulles. Since that time, Atlantic Coast has taken extensive steps to prepare for the launch of "Independence Air," including commitments for route planning consultants, reservations systems, call center ticket counters, gate luggage handling, aircraft servicing, and advertising, to augment its fleet of regional jets and departure/arrival gates at Dulles. In addition, Atlantic Coast announced on November 18, 2003, that it had reached a memorandum of understanding with Airbus Industrie AVSA ("Airbus") to lease and purchase 25 narrow-body planes to fly larger numbers of passengers over longer distances than ACA's current complement of 87 regional jets flies.

In the meantime, while Atlantic Coast was looking to change business models, Mesa sought to regain its stature as a regional air carrier for United following United's 1998 termination of a prior code-share agreement between United and Mesa. Those parties reached a new agreement on February 27, 2003, pursuant to which Mesa would operate ten aircraft under the United Express brand. On July 1, 2003, Mesa and United agreed that Mesa would operate an additional 35 UAX regional jets, with the option of adding 25 regional jets at a later date. The July agreement became effective in August 2003 and will expire in December 2013.

Mesa followed the United/ACA negotiations with a high degree of interest and incredulity that ACA would walk away from its relationship with United. Immediately after ACA announced its July 2003 decision to forego the United relationship and establish a low-cost airline at Dulles, Mesa contacted United and offered its assistance, in whatever way would help. United declined this offer, preferring to continue to negotiate with Atlantic Coast and to maintain its long-standing arrangements for feeder service at Dulles. Nonetheless, Mesa retained an advisor on August 1, 2003, to provide advice on an acquisition and began to acquire large amounts of ACA stock.

The record before the Court reveals that United had two concerns with ACA's announcement of its plans. To those who fly out of Dulles Airport frequently, it will come as no surprise that United depends heavily on the feeder traffic brought to Dulles from the surrounding states by UAX flights operated by Atlantic Coast. The entire hub-and-spoke system of the larger airlines depends on regional feeder airlines, like Atlantic Coast, to return a profit. Therefore, United could ill afford to lose the support of the ACA service at Dulles (or O'Hare Airport in Chicago, where Atlantic Coast is also a mainstay support to United's hub operations). In addition, the parties to this action estimate a potential loss in passenger traffic to United valued at about one-half billion dollars in two years if United were to face competition from a low-fare airline as planned by Atlantic Coast. The record supports the conclusion that potential competition from a low-fare airline operated by ACA is a significant concern to United, even if United believes that such a new airline could only survive for a few years.[1]

On October 6, 2003, Mesa announced a bid to acquire Atlantic Coast in a tax-free

---

1. Mesa witnesses testified at the preliminary injunction hearing that United would have no concerns about low-fare competition from Independence Air because United faces competition everywhere. United's internal documentation and the testimony concerning the United/ACA negotiations are to the contrary, as is common sense concerning a competitive threat estimated at one-half billion dollars.

stock exchange offer because Mesa "[r]ecogniz[ed] both the ill-advised nature of Atlantic's abandonment of its code-sharing model, as well as the strategic benefits associated with combining Atlantic's and Mesa's operations[.]" Defendant's Opposition to Plaintiff's Amended Motion for a Preliminary Injunction ("Defendant's Opposition") at 9. Atlantic Coast issued a press release on October 16, 2003, stating that the ACA Board would consider the merger proposal.

The day before, October 15, 2003, Mesa filed its first preliminary consent statement with the SEC, to which the SEC subsequently provided comments. Eight days later, Atlantic Coast announced its rejection of Mesa's exchange offer and reaffirmed its strategy to establish an independent low-fare airline. Atlantic Coast also set the record date for Mesa's consent solicitation at October 23, 2003, although Mesa challenged this date in a lawsuit in Delaware Chancery Court and ACA later withdrew it. Mesa filed a revised preliminary consent statement on November 21, 2003, and a second revised preliminary consent statement on December 2, 2003, which is the version to be referenced hereafter as the "Consent Statement." On December 9, 2003, the second day of the preliminary injunction hearing, counsel for Mesa reported that the SEC had approved the Consent Statement. (Mesa formally requested a list of shareholders and a record date and Atlantic Coast set the record date at December 12, 2003.)

On November 12, 2003, Mesa and United announced that they had entered into a non-binding Memorandum of Understanding ("United MOU"), agreeing in principle to terms under which both Atlantic Coast and Mesa "would operate as United Express carriers ... subject to the parties entering into definitive agreements and a

successful consent solicitation." Jaskow Decl. Exh. 5; *see* Taylor Dep. Exh. 14.

## II. ANALYSIS

### A. Legal Standard

In considering a request for preliminary injunctive relief, a district court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360 (D.C.Cir.1999); *see also Serono Lab. v. Shalala,* 158 F.3d 1313, 1317–1318 (D.C.Cir.1998). These factors "interrelate on a sliding scale" and a particularly strong showing on one may compensate for a weak showing on another. *Vencor Nursing Ctrs., L.P. v. Shalala,* 63 F.Supp.2d 1, 7 (D.D.C.1999) (quoting *Davenport,* 166 F.3d at 361).

### B. Securities Claims

 Atlantic Coast brings securities claims under two provisions of the Securities Exchange Act of 1934, § 14(a) and (e). Section 14(a) prohibits the solicitation by a proxy statement "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors[.]" 15 U.S.C. § 78n(a). In conjunction with Rule 14a–9, 17 C.F.R. § 240.14a–9, this section "disallow[s] the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of a material fact, or (2) an omission of a material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord,* 223 F.3d 1020, 1022 (9th Cir.2000). "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material

misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation . . . was 'an essential link in the accomplishment of the transaction.'" *Gen. Elec. Co. v. Cathcart,* 980 F.2d 927, 932 (3d Cir.1992) (quoting *Mills v. Elec. Auto–Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)). In general, the term "solicitation" includes any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a(1)(11)(iii). A misrepresentation or omission is material if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

■ Section 14(e) prohibits, in connection with a tender offer, any person from making untrue statements of material fact or leaving material omissions that would be necessary to make previous statements not misleading. 15 U.S.C. § 78n(e). For a plaintiff to succeed on a claim under § 14(e), there must be established "(i) a misrepresentation or omission of material fact; (ii) the requisite intent to deceive; and (iii) detrimental shareholder reliance." *Salsitz v. Peltz,* 227 F.Supp.2d 222, 225 (S.D.N.Y.2002). With respect to the second element, "a plaintiff must plead and prove an intent to defraud, knowledge of falsity, or a reckless disregard for the

truth." *Conn. Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 961 (2d Cir.1987) (internal quotations omitted).

As an overarching matter, ACA argues that Mesa has been engaged in solicitation within the meaning of the Exchange Act since its first, allegedly incomplete, consent statement was filed and that these earlier drafts of the Consent Statement remain available for investors to review on Mesa's web site. Accordingly, Mesa is alleged to continue to engage in solicitation based on bad documentation despite any corrections or additions in the revised statements.

More specifically, the Atlantic Coast Reply in Support of Its Amended Motion for a Preliminary Injunction ("ACA Reply") sets forth a virtual laundry list of ways in which it believes Mesa has violated §§ 14(a) and (e) of the Exchange Act, which the Court will address in turn.[2]

First and most critically, Atlantic Coast contends that Mesa has failed to disclose its own direct and material interests in seeking to remove the ACA Board, interests that are not shared by other Atlantic Coast shareholders. It is argued that Mesa will benefit from eliminating a potential competitor for United by receiving increased profit margins on trips that Mesa flies as United Express, even if the merger between Mesa and ACA is not consummated. In addition, if Mesa acquires Atlantic Coast and scuttles Independence Air, Mesa could use ACA's cash reserves, valued at more than $200 million, to alleviate Mesa's alleged financial difficulties. Mesa

---

**2.** This lawsuit began when Atlantic Coast submitted its initial Motion for a Preliminary Injunction based on the first preliminary consent statement. Since then, Mesa has filed two revised preliminary consent statements with the SEC that reflect changes addressing specifically *Atlantic Coast's* concerns. The ACA Reply is the first substantive briefing on the disclosure issues since the filing of the Consent Statement in December 2003. Atlantic Coast's Memorandum in Support of Its Amended Motion for a Preliminary Injunction analyzes only the antitrust claims. This decision will address the securities claims identified in the ACA Reply, supplemented by the oral argument on December 10, 2003, as they provide the best indication of Atlantic Coast's current legal position.

responds that it provided sufficient information in the Consent Statement for ACA shareholders to know that it benefits from the United MOU:

Furthermore, in the event that a Mesa/Atlantic Coast business combination is successfully consummated or if the Mesa nominees are elected to the Atlantic Coast board of directors pursuant to this consent solicitation and enter into a definitive code share agreement with United Airlines on terms substantially similar to those contained in the United MOU, the adjusted margins will apply to all Mesa aircraft that fly code share service for United Airlines. The revised margins are an improvement in the current Mesa relationship with United Airlines.

Lipton Decl. Exh. 49.

Second, Atlantic Coast argues that Mesa has failed to disclose United's alleged role as a participant in the consent solicitation process in violation of § 14(a). This "participation" was allegedly revealed by an answer from Jonathan Ornstein, Mesa's chief executive officer, to a financial analyst on October 7, 2003. Asked during a teleconference, "Where is United in all of this?", Mr. Ornstein responded that Mesa is

partnered with United Airline[s]. When [Mesa] announced that [Mesa] had discussed it with United, United has reaffirmed the fact to [Mesa] that they would like to come to an agreement with Atlantic [C]oast, they would like to maintain that Atlantic [C]oast has a feed operation and to the exten[t] that [Mesa] could be involved in that decision it would be helpful.

Lipton Decl. Exh. 1 at 15. Further evidence of United's "participation" is allegedly found in financial support from United to Mesa when United paid Goldman Sachs to give advice on the structure of the United MOU to avoid dilution of Mesa shareholder interest. Finally, Atlantic Coast notes that the first revised consent statement was delayed in its filing until after the United MOU was reached because the United MOU made the solicitation stronger to induce Atlantic Coast shareholders to vote in favor of Mesa's nominees to the ACA Board. Mesa denies that United is a participant or that it has contributed financially to the consent solicitation effort. Mr. Ornstein has testified that United is not "paying any of the costs that [Mesa is] having now" and that there is no anticipation that United would supply financing to facilitate any acquisition. Halper Decl. Exh. 16.

Third, Atlantic Coast submits that Mesa has made materially false and misleading statements about the beliefs, intentions, and qualifications of its proposed nominees to the Atlantic Coast board of directors. Atlantic Coast takes issue with Mesa's contention that it "consciously selected individuals that Mesa believed would act independently if elected[.]" Defendant's Opposition at 39 n. 10. In support, Atlantic Coast refers to deposition testimony by Mr. Ornstein that Andre Duggin, a proposed nominee, "generally supported" the proposed Mesa/Atlantic Coast combination and that Archille Paquette, another proposed nominee, already agreed that Mesa's plan to keep ACA as a regional airline was better. Supp. Lipton Decl. Exh. 10 at 36, 61. Atlantic Coast also calls into question nominee Theodore Kahan's personal relationship with Mr. Ornstein and the fact that Mr. Ornstein is a good friend of Mr. Duggin's son-in-law. Atlantic Coast finds a lack of independence by virtue of the fact that the proposed nominees are represented by Cadwalader, Wickersham & Taft, the same law firm that represents Mesa. And Atlantic Coast argues that the preliminary consent state-

ments falsely tout the proposed nominees as "highly qualified." Mesa defends the independence of its nominees: Mr. Paquette retired from a Mesa subsidiary over three years ago, Mr. Kahan's uncompensated business relationship with Mr. Ornstein is too attenuated to complicate his independence, social relationships are irrelevant, and all four nominees, deposed in this lawsuit, "uniformly testified that, if elected, they would act in the best interests of Atlantic stockholders and would under no circumstances be beholden to Mesa." Defendant's Opp. at 38.

Fourth, Atlantic Coast asserts that Mesa has made several false and misleading statements and omissions regarding the United MOU, including failing to disclose the actual terms of this agreement. For instance, Mesa presents the United MOU as an alternative to ACA's decision "to sever the historically stable and profitable relationship with [United] enjoyed by [Atlantic Coast.]" *Id.* Exh. 35. Atlantic Coast argues that this statement inaccurately characterizes its relationship with United, which became strained following United's bankruptcy filing. Atlantic Coast also contends that Mesa has misled shareholders by suggesting that the United MOU would result in Atlantic Coast operating as it has in the past, when in reality the United MOU would result in cutting the margin for UAX flights operated by Atlantic Coast to half the returns contained in the current United/ACA agreement. Taylor Dep. at 99. Mesa also discounted ACA's statement that ACA had rejected United's final offer because the offer contained profit margins tied to performance measures that were subject to change at United's discretion and because the offer was nonbinding and might be renegotiated after United emerges from bankruptcy. In a press release, Mesa

stated that these concerns were "either unfounded or have been addressed satisfactorily" in the United MOU. *Id.*, Exh. 28. Atlantic Coast contends that the text of the United MOU and testimony from Mesa officials reveal the validity of its concerns, so that the Mesa response was false and misleading. Mesa defends its statements as legitimate statements of opinion and optimism.

Fifth, Atlantic Coast argues that Mesa's preliminary consent statements failed to disclose material information with respect to alleged conflicts of interest and self-dealing on the part of Mesa's board of directors. In a related complaint, Atlantic Coast asserts that Mesa has failed to correct allegedly false and misleading statements and omissions with respect to insider trading and Mesa's purported history of profitability. Atlantic Coast contends that Mesa has not disclosed that Mesa insiders apparently sold over 386,000 shares of Mesa stock in August and September 2003, at a time when Mesa allegedly knew it would be making an offer for Atlantic Coast and was buying 1.1 million net shares of Atlantic Coast stock. According to Atlantic Coast, this conduct "belies Mesa's statements that its proposals for Atlantic Coast would benefit Atlantic Coast and Mesa stockholders and also violates SEC Rule 10b–5 because the Mesa insiders were trading based on their nonpublic knowledge that Mesa would be making an offer for Atlantic Coast." ACA Reply at 77. A further omission concerns purchases of Mesa stock by alleged insiders in February and March 2003, shortly before Mesa publicly announced a $12 million reversal of earlier restructuring charges. Mesa's claim that it offers a "proven strategy of long-term profitability" to ACA shareholders [3] is also attacked because Mesa has reported net losses in

---

3. Lipton Decl. Exh. 4.

four of the last five fiscal years. Mesa responds that its statements concerning its financial position represent good-faith expressions of optimism and opinion and that they were accurately based on operating profits, not the audited financials. Moreover, Mesa states that its audited financial statements are readily available to the general public. Mesa also argues that the stock trades that concern ACA have all been disclosed, were not improper, and are immaterial to the question before the ACA shareholders. Finally, Mesa attests that the trading in August and September 2003 occurred prior to, and without knowledge of, the hurried decision to send a proposal to acquire Atlantic Coast advanced by Mesa on October 7, 2003.

Sixth, Atlantic Coast contends that Mesa's intentions are unclear as to whether its goal is merely to replace the ACA Board or also to commence an exchange offer, and that shareholders should know whether an exchange offer is really intended before they vote.

For purposes of a preliminary injunction and at this early stage of the litigation, the Court concludes that Atlantic Coast has not shown a substantial likelihood of prevailing on almost all of its claims under §§ 14(a) and (e) of the Exchange Act. With respect to the § 14(e) claims, in particular, Atlantic Coast has not met its burden of demonstrating the requisite intent to deceive. To the extent that any of Mesa's statements or omissions during the consent statement process may have been questionable or incomplete, the Court believes that the final Consent Statement has addressed any earlier disclosure infractions at issue in this case. The Consent Statement contains corrective disclosures, references to SEC filings, and a description of this lawsuit. Given the publicity attendant to this dispute, the Court finds that the "total mix" of information avail-

able to ACA shareholders includes a full description of ACA's concerns. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757; *Woodward & Lothrop, Inc. v. Schnabel*, 593 F.Supp. 1385, 1401 (D.D.C.1984).

■■■ Turning to some of the enumerated problems Atlantic Coast has identified, the Court finds that Atlantic Coast has not shown a substantial likelihood of proving that Mesa's statements or omissions concerning Mesa's past financial performance are materially false or misleading. For one, Mesa has accurately reported its operating or *pro forma* financial results, which are different from those under Generally Accepted Accounting Principles. In addition, the Consent Statement discloses selected historical financial data and refers shareholders to the full text of Mesa's SEC filings—readily available to the general public through the EDGAR database on the SEC's website—for more information. Supp. Lipton Decl. Exh. 49, at 64–75.

Atlantic Coast also has not established a substantial likelihood of succeeding on its claim that United is an undisclosed participant in Mesa's solicitation. Item 4(b)(6)(a)(v) of Schedule 14A defines a participant as "[a]ny person who lends money or furnishes credit or enters into any other arrangements, pursuant to any contract or understanding with a participant, for the purpose of financing or otherwise inducing the purchase, sale, holding or voting of securities of the registrant by any participant or other persons . . . ." Schedule 14A of Rule 14a–101. There is no evidence that United has given funds *directly* to Mesa in furtherance of the consent solicitation. In the absence of a financial contribution, courts generally require compelling evidence that a third party plays a fairly active role in the proxy contest in order to be deemed a participant. *See Lone Star*

*Steakhouse & Saloon, Inc. v. Adams,* 148 F.Supp.2d 1141, 1153–54 (D.Kan.2001). United's retention of Goldman Sachs to aid in structuring the United MOU for the purpose of allaying Mesa's dilution concerns does not appear to rise to the level of a participant in the consent solicitation. In addition, shareholders are notified by the Consent Statement that ACA believes that United is a "participant," such that they have sufficient notice of this point to the extent it might affect their decisions. *Id.* Supp. Lipton Decl., Exh. 49, at 35.

It is more troubling that Mesa has provided such limited disclosure concerning the financial benefits to Mesa under the United MOU. While leases and potential future relationships are noted, the heart of the Mesa-specific and immediate benefit is more veiled. In fact, should Mesa's nominees be elected to the ACA Board and agree to maintain ACA as a UAX carrier, Mesa will earn increased rates on all Mesa UAX flights. It would not be necessary for Mesa to complete the acquisition of Atlantic Coast to enjoy these higher rates, as long as the new ACA Board reaches agreement to fly as a regional carrier for United substantially under the terms of the United MOU. The Consent Statement advises that "the adjusted margins will apply to all Mesa aircraft" and that they "are an improvement in the current Mesa relationship" but gives no dollar value or range of any kind to evaluate this improvement to Mesa's own arrangements with United and whether they might influence Mesa's actions and recommendation. *See* Lipton Decl. Exh. 49.[4] The Court finds that this is a material omission of a fact that reasonable shareholders might want or need to know and that, as to this alleged

omission, Atlantic Coast has shown a likelihood of success on the merits.

Next, Atlantic Coast has not shown a substantial likelihood of success on its claim that Mesa made material statements or omissions regarding alleged conflicts of interest of Mesa's nominees for the ACA Board. "At bottom, the question of independence turns on whether a director is, *for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind. That is, the Supreme Court cases ultimately focus on impartiality and objectivity." *In re Oracle Corp. Deriv. Litig.,* 824 A.2d 917, 938 (Del.Ch.2003) (quoting *Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1232 (Del.Ch.2001)). The evidence of prior business or social relationships is insufficient to render the Mesa nominees unfit to be directors. Similarly, the mere fact that a nominee expresses a supportive opinion about a proposed transaction does not mean that the nominee will not exercise independent business judgment if asked to consider it as a board member. The Court doubts that shareholders would consider the alleged facts regarding the nominees "important in deciding how to vote[,]" given that nominees attempting to replace a company's board of directors ordinarily have *some* prior connection to their sponsor. *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126. In any event, shareholders are put on notice in the Consent Statement of alleged loyalty issues relating to Mesa's nominees, which the Court does not consider overtly suspicious. *See* Supp. Lipton Decl. Exh. 49, at 17.

Atlantic Coast's request for injunctive relief on its claims that Mesa has failed to disclose certain business relationships between Mesa and its board members, as

---

4. In this regard, it is to be noted that Mesa negotiated with United in February 2003 to regain its position as a UAX carrier and, pre- sumably, found the rates in that agreement perfectly satisfactory.

well as insider stock transactions, also does not fulfill the applicable standard of substantial likelihood of .success on the merits. Mesa's SEC filings, in conjunction with the description of this lawsuit in the Consent Statement, adequately inform shareholders of these allegedly material actions. *See Bertoglio v. Texas Int'l Co.,* 488 F.Supp. 630, 642 (D.Del.1980) ("[T]he 'total mix' of information available to the shareholders can be established by reference to other publicly disseminated information of which the shareholders are presumably aware."). As mentioned above, Atlantic Coast's shareholders, as well as the general public, can easily access these filings through the EDGAR database on the SEC's website, which is free and contains instructions for retrieving company documents. Given the widespread availability and use of the Internet today, there is no need for Mesa to attach paper copies of these documents to its definitive Consent Statement when interested shareholders can simply view them on-line.

■ Having concluded that Atlantic Coast has a likelihood of success on the merits of only one of its securities claims, the Court will not linger over the other criteria for injunctive relief. Atlantic Coast argues that it will be irreparably injured if the consent process goes forward without a cooling off period and a corrected consent statement. Inasmuch as there is only one omission catalogued above for which Atlantic Coast has shown a likelihood of success, and that ACA can draw the attention of its shareholders to that omission in its own Consent Revocation Statement, the Court finds that there is a failure of proof of irreparable harm. In contrast, Mesa would suffer harm as a shareholder who desires a timely change in

the ACA Board if, because of this single omission, the Court ordered a correction and cooling off period. The public interest generally supports corrective action here so that a shareholder vote can be fully informed. The precise rate structure agreed upon by United and Mesa, and the improvements to it since the initial February 2003 negotiations between those parties, is not publicly known and is not available to ACA shareholders to discover. What is critical, however, is that the shareholders receive information that Mesa will benefit individually if the solicitation succeeds and a new ACA Board retains ACA in United livery. To some extent, the Consent Solicitation has achieved that goal and the Consent Revocation Statement can further it. For these reasons, the Court finds that the securities allegations do not warrant injunctive relief.

## C. Antitrust Claims

Atlantic Coast's antitrust claims arise under § 1 of the Sherman Act, § 7 of the Clayton Act, and the District of Columbia Antitrust Act at D.C.Code § 28–4502, which parallels §. 1 of the Sherman Act.[5] Section 1 of the Sherman Act declares illegal "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations[,]" although the Supreme Court has recognized that this provision was intended to prohibit only *unreasonable* restraints. 15 U.S.C. § 1; *see also, e.g., Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Section 7 of the Clayton Act prohibits any acquisition of the stock or assets of another company where "the effect of such acquisition may be sub-

---

5. The District of Columbia and the Commonwealth of Virginia have filed briefs *amicus curiae* in support of Atlantic Coast's petition for a preliminary injunction. Both jurisdictions inform the Court that they have initiated investigations of the consent solicitation.

stantially to lessen competition[.]" 15 U.S.C. § 18.

Atlantic Coast's antitrust claims are best described in that company's own words:

> United needed a partner to help it extinguish emerging competition from Atlantic Coast, and Mesa stepped forward to help United eliminate this competition. In return, United has agreed to compensate Mesa through increased margins across all of Mesa's United Express routes. If the Consent Solicitation is successful, new competition will be foreclosed, consumers and Atlantic Coast will be harmed, and the conspirators will share the spoils.

Plaintiff's Amended Motion at 10. To support its claims of an antitrust violation, Atlantic Coast must demonstrate "(1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce." ABA Section of Antitrust Law, Antitrust Law Developments 2 (4th ed.1997). "[A] private plaintiff seeking damages or injunctive relief must prove that, respectively, he has suffered or is likely to suffer antitrust injury." *Id.* n. 10. There is no dispute about whether interstate commerce is affected here.

### 1. Antitrust Injury

As a threshold matter, the Court must determine whether Atlantic Coast has standing to bring its antitrust claims. A plaintiff suing under the antitrust laws must demonstrate "antitrust injury," which the Supreme Court has defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant['s] acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of

anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Cargill v. Monfort of Colo., Inc.,* 479 U.S. 104, 109, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

There is a split in the circuits as to whether the target of an acquisition has standing to complain about potential antitrust violations that might arise from a merger or acquisition. There is no precedent in this Circuit to guide the Court. Two illustrative cases are *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252 (2d Cir.1989) and *Anago, Inc. v. Tecnol Medical Products, Inc.,* 976 F.2d 248 (5th Cir.1992). In *Consolidated Gold Fields,* the target of a tender offer alleged that the proposed acquisition would substantially lessen competition in the international gold market because the combined entity would hold a 32% market share. The Second Circuit expressed concern that consummation of the merger would cause the target to lose its ability to compete independently and ultimately held that "a member of a section 1 conspiracy has standing to challenge the restraint upon its freedom to compete, even though, in the long run, it may enjoy the benefits of the cartel." *Consol. Gold Fields PLC,* 871 F.2d at 258. Three years later, the Fifth Circuit took a very different view. In *Anago,* the acquisition target similarly argued that a takeover would dramatically decrease competition and raise prices in the relevant market, as well as result in the loss of the target's power of independent decision-making. The Fifth Circuit expressly disagreed with the *Consolidated Gold Fields* analysis and held that the loss of independent decision-making is not the type of injury meant to be prevented by the antitrust laws. *See Anago,* 976 F.2d at

250–51.[6] Mesa argues that this is a takeover case and that "every case that is still good law [after *Cargill*] outside of the Second Circuit ... has held that acquisition targets are absolutely precluded from challenging purported antitrust violations arising from the potential merger." Def. Opp. at 52. Atlantic Coast counters that *Consolidated Gold Fields* is the better view of the law and that, in any event, it has standing as a potential competitor. "[T]he injury that Atlantic Coast will suffer if the injunction is not granted ... is the termination of its entry into the market as a new horizontal competitor to United." ACA Reply at 45.

Mesa's legal argument is too "absolute[ ]," Def. Opp. at 52, and does not admit the possibility that a target might allege, as here, a true antitrust injury. The Court concludes that Atlantic Coast has demonstrated an antitrust injury with respect to its claim under § 1 of the Sherman Act and D.C.Code § 28–4502,[7] but not for purposes of § 7 of the Clayton Act.[8]

Taking the Clayton Act claim first, if the exchange offer is accomplished so that there is an acquisition (thus implicating § 7 of the Clayton Act), Atlantic Coast will become part of Mesa and enjoy the exact same benefits from the anticompetitive conduct as the alleged conspirators. Once part of Mesa, it is difficult to perceive an "antitrust injury" to Atlantic Coast, as Mesa has no incentive to structure a deal that would harm itself. As well, there would be no loss of independent decision-making—the "antitrust injury" declared in *Consolidated Gold Fields*—in conjunction with this particular merger because Atlantic Coast, itself, has to approve any transaction with Mesa before there can be a substantial lessening of competition for purposes of § 7 of the Clayton Act. Unlike the target in *Consolidated Gold Fields*, shareholders in Atlantic Coast have the opportunity through the consent solicitation to determine for themselves whether they are willing to have Mesa nominees elected to the ACA Board, persons who are advertised as having a more positive attitude toward a potential stock exchange. Through this vote, Atlantic Coast shareholders must essentially agree to the possible acquisition and so ACA would be a willing participant in the cause of its injury. This being the case, Atlantic Coast could not claim to be a victim of any resulting anticompetitive effect after an acquisition. As a result, the Court need not determine whether it is more likely that the D.C. Circuit Court will follow *Gold Fields* or *Anago;* under either analysis, on these facts, Atlantic Coast does not have standing under the Clayton Act.

6. Following *Anago, Moore Corp. Ltd. v. Wallace Computer Services, Inc.*, 907 F.Supp. 1545, 1566 (D.Del.1995), gave three reasons for refusing to recognize target standing. "[C]ourts have regarded any alleged injury suffered by a target in a merger as being inherent to the merger process rather than flowing from any anticompetitive effect of the merger." *Id.* (citing *Burnup & Sims, Inc. v. Posner*, 688 F.Supp. 1532 (S.D.Fla.1988)). "[R]ather than suffering injury, the target and its shareholders ultimately benefit from any increased prices or decreased competition stemming from the merger." *Id.* (citing *Anago*, 976 F.2d at 251). "Finally, courts have even found that disingenuous antitrust suits may be brought by targets to thwart the loss of control to be suffered by management, as opposed to any motives relating to antitrust." *Id.*

7. Whenever the Court refers to § 1 of the Sherman Act in its Analysis, it also refers to the claims brought under the parallel provision of the D.C.Code, § 28–4502.

8. The Court's ruling that Atlantic Coast does not have standing to bring its Clayton Act claim has little practical impact on this suit since the parties have concentrated their attentions and arguments on the Sherman Act claim.

■ The claim under § 1 of the Sherman Act differs because it does not require a hostile takeover to achieve an anticompetitive effect. The United MOU contemplates that Mesa will replace the ACA Board with its own nominees, or acquire Atlantic Coast, and that ACA will then execute an UAX agreement with United on terms "substantially similar to those contained in the United MOU." Taylor Dep. Exh. 15. The complaint challenges this agreement as having the necessary or inevitable effect of keeping Atlantic Coast from launching Independence Air to compete in the marketplace against United; this is "the type [of injury] the antitrust laws were designed to prevent." *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 813 (D.C.Cir.2001). This would not be a result that "actually tended to benefit" Atlantic Coast. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court concludes that Atlantic Coast has properly alleged an "antitrust injury" under § 1 of the Sherman Act and will limit its analysis to the effects of the alleged conspiracy on ACA as a potential competitor through Independence Air.[9]

### 2. Concerted Action

■ Before liability may be imposed under § 1 of the Sherman Act, a plaintiff must show some form of concerted action; § 1 does not proscribe unilateral or independent conduct, no matter how anticompetitive it might be. Concerted action may be proven by direct or circumstantial evidence; in the latter instance, "[t]here must be evidence that tends to exclude the possibility that the [alleged conspirators] were acting independently." *Monsanto*

*Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

United and Mesa have entered into an accord pursuant to which Atlantic Coast would continue as a UAX carrier if either of two contingencies is met—a successful consent solicitation and decision by a new ACA Board to remain with United, or a Mesa acquisition of Atlantic Coast. The nature of this agreement is obviously "concerted" because it involves multiple parties. It is the purpose or effect of this acknowledged agreement that is at issue.

The "correct standard" for determining whether there is concerted action for an illegal purpose depends on "evidence that tends to exclude the possibility of independent action by the [parties]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 768, 104 S.Ct. 1464. Atlantic Coast argues that the United MOU constitutes sufficient evidence to support an inference that United and Mesa have a "common design," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (citation omitted), because it would "kill off" Independence Air.

Mesa argues that it was "merely following its own business self-interest when it decided that Atlantic Coast should not operate a low-fare airline;" therefore, it was acting unilaterally and not in an illegal combination with United. Defendant's Opp. at 59. In its brief, Mesa describes its business self-interest as based on " 'a lot of analysis internally as to whether ... a low cost strategy would make sense,' " *id.,* but

---

9. Mesa had no answer to the Court's question as to why Atlantic Coast did not have standing as a potential competitor, even if not as a target, and the Court deems the issue almost conceded.

then testified that there was no documentation for the alleged analysis and that the decision to make the exchange offer was reached in a matter of a few days without a speck of due diligence to support it. The Court discounts this "analysis" as advertising for the benefit of Wall Street on an analysts' call. Further, Mesa states that it acted in its own self interest because industry analysts report that ACA's " 'strategy has never been successfully implemented,' " and that the margins of low-cost airlines are " 'all over the board' " instead of the constant margins that are available under a code-share agreement. *Id.* Mesa's last two points to demonstrate its business self-interest are its belief that a low-fare airline is " 'a highly risky strategy' " at which others have failed and the fact that ACA stock "plummeted 33%" when Atlantic Coast announced its plans. *Id.* at 60. These arguments address Mesa's business judgment as to why it remains committed to the regional airline concept. They do not demonstrate why it would be in Mesa's corporate self-interest to have Atlantic Coast remain a UAX carrier. It would appear more logical for Mesa to try to supplant Atlantic Coast as a favored UAX carrier than to retain it.

There is, of course, one direct benefit to Mesa from the United MOU. Should either of its approaches successfully retain ACA as a UAX carrier, Mesa will enjoy an increase to its own rates on UAX flights in other parts of the country. Atlantic Coast argues that these rate increases are the *quid pro quo* for Mesa's agreement not to operate a low-fare airline if the consent solicitation is successful and, therefore, are proof of the conspiracy and not proof of an independent self interest. Mesa retorts that the United MOU does not require Mesa to refrain from operating a low-cost airline and the rate increases are only circumstantial evidence, which does not support the inference of a conspiracy. *Matsushita,* 475 U.S. at 588 n. 21, 106 S.Ct. 1348 ("[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.").

Mesa would apply the standard for summary judgment and not the standard that applies at the preliminary injunction stage.[10] For purposes of a preliminary injunction, a plaintiff need not supply the full evidence that would be required by the end of discovery to win summary judgment or prove the necessity for a trial. The record, described below, is clear that United was concerned about competition from Independence Air and Mesa was concerned for United's welfare and did not think Independence Air was in United's interest. Whatever Mesa's self-interest might have become by the time it negotiated an increase in its UAX rates in November 2003, that result does not explain why Mesa would have had a prior corporate *self-interest* in preventing the flight of Independence Air, except to help out United in whatever way it could. The curious lack of notes from Mesa's negotiations with United results in an absence of contemporaneous support and Mesa's testimony that United had no concerns about competition from Independence Air is contradicted. With clarity that both United and Mesa wanted to avoid competition to United, and that the United MOU is one way to

---

**10.** *See Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348 ("To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. [A plaintiff], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action ....")(internal citations omitted).

achieve that result, and with inconsistencies and unlikelihoods in Mesa's evidence, the Court concludes that Atlantic Coast has a significant likelihood of success at proving the existence of concerted action with the effect of restraining a potential competitor.

### 3. Unreasonable Restraint of Trade or Competition

■ Section 1 of the Sherman Act prohibits only those agreements "which [are] unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *see also, e.g., NCAA v. Bd. of Regents,* 468 U.S. 85, 98, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). To the extent that the United MOU might be read to limit competition between United and its regional carriers, Mesa cites *Rothery Storage* to defend the agreement's "'redeeming competitive virtues'" that preserve the efficiencies of the major airline hub-and-spoke system to the benefit of consumers. *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 228–29 (D.C.Cir. 1986). According to Mesa, this legitimate business motive is proved, *inter alia,* by the assertion that Atlantic Coast itself was willing to accept the essential terms of the United MOU except that ACA and United could never agree on financial terms. Mesa's basic hypothesis is that (a) since it is perfectly lawful for Mesa and United, as code share partners, to agree to minor competitive restraints that are "ancillary to the contract integration ... that constitutes" the UAX system, *id.* at 229; and (b) since it would be perfectly lawful for Atlantic Coast and United to make the same agreement; then (c) there is nothing unlawful about Mesa agreeing to these terms taking effect at Atlantic Coast only if and when there is a change on the ACA Board that then accepts the United MOU, or Mesa acquires Atlantic Coast.

*Rothery Storage* instructs that "an ancillary horizontal restraint [between United and Independence Air], one that is part of an integration of the economic activities of the parties and appears capable of enhancing the group's efficiency [between United and Mesa/ACA], is to be judged according to its purpose and effect." *Id.* The question presented under the Sherman Act is, then, whether an otherwise lawful agreement becomes unlawful because it has anticompetitive effects in addition to those that contribute to the parties' efficiencies?

That conspirators may have different underlying motives for restraining potential competitors does not vitiate the existence of a § 1 conspiracy. *See Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 212–15 (3d Cir.1992). As in *Fineman,* United and Mesa are vertically aligned. The renewed relationship between the two is one of the successes of which Mr. Ornstein is most proud. Although Mesa and Atlantic Coast are not direct competitors, Mesa "would naturally perceive that that which is in [United's] interest also inures to [Mesa's] benefit." *Id.* at 212. By supporting United's retention of ACA as its Dulles code share partner, Mesa might also be seen to be acting contrary to its own self interest, which might more commonly lie in replacing Atlantic Coast as the UAX carrier for United. *Cf. id.* at 214 n. 32 (no need to show that a party in a vertical relationship acted contrary to its own self interest). "A rational factfinder could infer agreement with the objective from knowledge of the objective and action calculated to achieve the objective despite differing motives." *Id.* at 212.

Atlantic Coast alleges that Mesa and United have conspired to suppress potential competition by stopping the launch of Independence Air, a low-fare option that expects to operate hundreds of daily de-

partures and carry tens of thousands of passengers from Dulles by the end of its first year. Mesa responds that the United MOU only aims to maintain Atlantic Coast as one of United's regional air carriers, conduct that Mesa contends "does not restrain trade at all, let alone restrain trade unreasonably." Def. Opp. at 56.

The Court would readily agree with Mesa's arguments if the United MOU were merely an agreement between Mesa and United, or between ACA and United, to provide regional jet feeder service at Dulles. Indeed, if Independence Air were not a valid potential contender, and Mesa stepped in to resolve a contract dispute over prices between United and ACA, the United MOU would merely represent the certainty of the direction in which Mesa wants to take Atlantic Coast. That is, the United MOU would assure shareholders that a deal with United is still possible if they vote for the Mesa nominees on the ACA Board.

Thus, were it not for Independence Air, the Court would find no antitrust issue. On these facts, however, the United MOU would have the effect of cutting off potential competition to United from Independence Air. In one sense, that is the entire point to Mesa's campaign to replace the ACA Board or to acquire ACA: to turn Atlantic Coast away from Independence Air and back into a code share partnership with United. The United MOU and Mesa announcements are clear that Atlantic Coast assets would be devoted to UAX flights, that Mesa/ACA would terminate the Airbus order for narrow-body airplanes (with expected help from United), and that Mesa/ACA would not be part of a non-United hub operation at airports that are major United hubs. Thus, the opportunity for starting Independence Air would be gone. The terms of the United MOU may not be unusual for a bilateral agree-

ment between a major airline and its regional partner. *Compare Rothery Storage,* 792 F.2d 210. Here, however, it is a bilateral agreement with trilateral effect: Mesa agreed with United to terms that could force Atlantic Coast to drop its plans to compete with United.

The record supports the conclusion that United wanted to retain Atlantic Coast as a UAX carrier at Dulles to retain its feeder operation *but also* wanted to avoid competition from Independence Air. When negotiators for United and ACA met in early August, United's spokesperson warned ACA that "if Atlantic Coast and United could not agree on a structure, United was capable of being 'irrational' " and it "was in both parties' interest to avoid a bloodbath." Surratt Dep. at 119, Exh. 19. "A deal with ACA [was] preferred *because competing directly against ACA will almost certainly result in lower revenues to United."* Taylor Dep. Exh. 11, p. 2 (emphasis added). The option of replacing ACA (as United has told the bankruptcy court it could and would do) and competing against Independence Air "present[ed] huge competitive issues that essentially boil down to reduced revenues to United." *Id.* At the end of August 2003, internal United documents recognized that "competing with ACA will result in lower revenue to United, both from a customer mix perspective and a yield perspective. Forecasts on the exact revenue risk associated with ACA becoming a direct competitor will be finalized next week and presented to the Executive Council," *i.e.,* in September. Taylor Dep. Exh. 11. Presumably with these forecasts in mind, Greg Kaldahl, United's Director for Regional Carriers, "suggest[ed on September 3, 2003] that if [United] had to compete with Atlantic Coast low-fare carrier at Dulles it would incur substantial revenue losses . . . . [C]ompetition from Atlantic Coast over that two-year period would negatively

affect United's system-wide profits more severely than competition from JetBlue." Second Nordling Decl. ¶ 11.

One comparison is apt: Early in August, United told ACA that an agreement between those parties would not preclude the start-up of Independence Air. *See* Second Skeen Decl. ¶ 7. By the time of United's last offer on September 30, 2003, United "include[d] an offer only for ACA to remain a UAX partner[,] not an offer that would allow ACA to work with UA and compete against it." Taylor Dep. Exh. 19; *see also* Surratt Dep. Exh. 2. It appears from the record that Mesa also had two sets of objectives in negotiating the United MOU. Understandably, Mesa was primarily interested in its own welfare. The fallout between United and ACA gave Mesa the necessary leverage in November 2003 to obtain higher rates system-wide for all Mesa UAX flights. But Mesa also recognized the value of removing the competitive threat from Independence Air. In October 2003, announcing its bid for ACA, Mr. Ornstein told market analysts that "if Atlantic [C]oast was to go and begin a separate entity, I don't think that would be in the interest of United or U.S. Air." Lipton Decl. Exh. 1, p. 14.[11]

Against this evidence of a visible and shared concern about competition and United's welfare, Mesa argues that the United MOU would allow Mesa/ACA to compete with United. Def. Opp. at 60 n. 23 ("[T]he agreement between Mesa and United does not require Mesa to refrain from operating a low-cost airline ....."). The Court agrees. As a practical matter, the United MOU might prevent the launch of Independence Air but that would be because the Atlantic Coast fleet would be otherwise occupied as a UAX carrier. The terms of the United MOU do not require this result. In fact, the United MOU by itself cannot force any change or require any particular result. As outsiders, United and Mesa could agree that Atlantic Coast should fly to the moon but any such agreement would not affect the plans or future of ACA *unless* the shareholders voted to change the members of the ACA Board and then those new members agreed to head into space.

Nonetheless, the evidence supports the Atlantic Coast argument that Mesa has been eager to help United solve its problem with ACA, that United is concerned about potential competition from ACA/Independence Air, that Mesa is concerned for the welfare of United directly relating to that competition, and that Mesa has essentially pledged to the market and the shareholders that it will operate ACA pursuant to the United MOU and end all plans for a low-fare airline. One clear "effect" of this outcome would be the death of Independence Air. The Court finds that Atlantic Coast has a significant likelihood of success at proving a reasonable inference of conspiracy "in light of the competing inferences of independent action." *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348.

### 4. Rule of Reason

Most antitrust claims are analyzed under a "rule of reason," according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competi-

---

11. There are many instances in the transcript of the injunction hearing of testimony by Mesa's witnesses that was internally inconsistent and not entirely forthcoming, and, therefore, it is not fully credited. For example, Mesa testified that there might not be any records of the discussions between United and Mesa over a two-week period, which the Court concludes is an unlikely state of affairs for critical negotiations with a major carrier that is in the midst of a bankruptcy reorganization.

tion, taking into account a variety of factors, including specific information about the relevant business, its conditions before and after the restraint was imposed, and the restraint's history nature, and effect.[12]

*State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

■ The general issue is "whether the restraint's anticompetitive effects substantially outweigh the procompetitive effects for which the restraint is reasonably necessary." ABA Section of Antitrust Law, Antitrust Law Developments 53 (4th ed.1997).

■ Mesa argues that the United MOU is procompetitive, "allow[ing] Atlantic Coast to collaborate with United to provide more efficient service to markets that United cannot economically serve with its own assets, while giving passengers served by Atlantic Coast access to efficient online connections, frequent flyer programs, and other benefits a major carrier can provide." Def. Opp. at 56. Therefore, according to Mesa, even if the United MOU has some anticompetitive impact, its procompetitive effects outweigh that impact and render it lawful. In contrast, Atlantic Coast argues that the effect of the United MOU is anti-competitive since, without it, Independence Air would add choice for passengers flying from Dulles, add significantly to the number of flights from Dulles, and lower fares for consumers. In addition, Atlantic Coast notes that United would replace ACA as its UAX carrier at Dulles and thereby assure that the launch of Independence Air would add capacity to the market.

The Court finds that Independence Air could be a significant entrant in the Dulles market as a low-fare airline along the model of Southwest Air. Atlantic Coast currently controls 22 gates at Dulles, operates more than 80 of its own regional jets, has committed to purchase 25 Airbus A319 and A320 aircraft (with over 130–passenger seating capacity, suitable for coast-to-coast flights), has years of operating experience, has over $200 million in cash, and has taken the necessary steps to enter the market, such as negotiating new pay and work rules with its pilots, contracting for a reservation system, and developing a marketing campaign. Independence Air is not a pipedream. It has the real potential to become an active and actual competitor when Atlantic Coast is released from its UAX contracts with United. The entry of a real competitor "necessarily has significant procompetitive effects, at least to the extent of 'shaking things up.'" *BOC Int'l, Ltd. v. FTC,* 557 F.2d 24, 27 (2d Cir.1977) (internal citations omitted).

The procompetitive effects identified by Mesa do not outweigh these considerations. It would appear from the record that United will replace ACA as its UAX carrier at Dulles and thereby provide many of the procompetitive market forces identified by Mesa without precluding competition from Independence Air. On this fact pattern, the "rule of reason" does not address the alleged anticompetitive effort to restrain competition from Independence Air and does not counsel against a potential Sherman Act violation or a preliminary injunction.

### D. Irreparable Harm

■ The antitrust laws exist to protect competition, not competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The

---

**12.** Atlantic Coast does not argue that the alleged conspiracy between Mesa and United is *per se* unlawful. *See generally United States v.* *Topco Assocs., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

identity of the members of the ACA Board is, therefore, not the issue. What matters is the realistic chance of harm to competition if the consent solicitation proceeds, i.e., the loss of a potential low-fare competitor at Dulles and the certainty of a period of instability for Independence Air, with concomitant potential harms from loss of vendor contracts and timely development of consumer interest in the new airline. While the specific members of the ACA Board could be restored after a vote, if preliminary relief were denied at this point and Atlantic Coast later won on the merits, there is no retrospective relief that would be able to cure the harm to the external business relationships, financial position, and reputation of Independence Air that will be necessary for it to compete in the business market. The harm to Mesa, on the other hand, is not irreparable but only monetary. Mesa may lose increased rates for its own UAX flights but the previous rates, at whatever level they were negotiated, were fully acceptable to Mesa last February.[13] The harm Mesa may experience as a shareholder unable to obtain a vote on the consent solicitation is discounted because that impact can be ameliorated by setting this matter for early resolution on the merits. The Court finds that Atlantic Coast has shown a very strong likelihood of irreparable harm, which favors issuance of a "status quo" injunction.

### E. Public Interest

■ The public interest is served by ensuring no unreasonable restraints on competition. "The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C.Cir.2001). In addition, the Court has been requested by the District of Columbia and the Commonwealth of Virginia to grant a preliminary injunction to give those entities an opportunity to consider these matters under local law. Having found that Atlantic Coast has raised serious questions of a potential antitrust violation, the Court also finds that the public interest will be best served by the entry of a preliminary injunction to retain the status quo until this matter can be finally resolved.

### III. CONCLUSION

For these reasons, the Court will grant the motion for a preliminary injunction enjoining Mesa from proceeding with the consent solicitation or exchange offer until this matter can be heard and decided on the merits. A separate Order accompanies this Memorandum Opinion.

### ORDER

Pending before the Court is the motion of the plaintiff, Atlantic Coast Airlines Holdings, Inc., for preliminary injunctive relief. Upon consideration of the entire record in this matter, including the briefs, exhibits, and testimony and arguments at the preliminary injunction hearing, it is this 18th day of December, 2003, hereby

ORDERED that the Amended Motion for a Preliminary Injunction [dkt. no 24] is

---

13. Mesa testified that the consent solicitation and change to the ACA Board were more attractive than Mesa's original stock exchange offer because a change in the board, unlike an acquisition, would not allow Delta Air Lines to cancel certain contracts with Atlantic Coast on which older aircraft are in use. Inasmuch as Mesa did no due diligence before making its exchange offer, and admittedly made the proposal because Mesa feared that United would contract with new UAX partners for Dulles traffic without including Mesa, the possibility of a stock exchange offer between Mesa and Atlantic Coast remains very uncertain and is not considered in balancing the harms.

**GRANTED** in part and **DENIED** in part; and it is

**FURTHER ORDERED** that the Amended Motion for a Preliminary Injunction with respect to claims arising under the Securities Exchange Act of 1934, §§ 14(a) and (e) is **DENIED;** and it is

**FURTHER ORDERED** that the Amended Motion for a Preliminary Injunction with respect to claims arising under § 7 of the Clayton Act, 15 U.S.C. § 18, is **DENIED;** and it is

**FURTHER ORDERED** that the Amended Motion for a Preliminary Injunction with respect to claims arising under § 1 of the Sherman Act, 15 U.S.C. § 1, and under D.C.Code § 28–4502 is **GRANTED;** and it is

**FURTHER ORDERED** that Mesa Air Group, Inc. is preliminarily enjoined from moving ahead with the consent solicitation or the exchange offer pending final resolution of this matter before this Court; and it is

**FURTHER ORDERED** that plaintiff shall submit security in accordance with FED. R. CIV. P. 65. The Court shall designate the amount of security after the parties have filed supplemental briefs on that issue. All parties shall contemporaneously file supplemental briefs on or before December 22, 2003 The Court will not accept oppositions or replies without further Court Order; and it is

**FURTHER ORDERED** that the Motion to Dismiss [dkt. no. 87] is **DENIED** without prejudice.

**SO ORDERED.**